UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |  |
|---|---|---|---|
| AUCTUS FUND, LLC, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | CIVIL ACTION | |
| | ) | NO. 19-11027-WGY | |
| SAUER ENERGY, INC., | ) | | |
| | ) | | |
| Defendant. | ) | | |

YOUNG, D.J.                                    March 16, 2020

**MEMORANDUM AND ORDER**

## I.    INTRODUCTION

Do the words "nine months" mean nine months?  That is the
odd question the Court confronts in deciding whether this
plaintiff has stated a claim for relief under the Securities
Exchange Act of 1934.  See First Am. Compl. Demand Jury ¶¶ 1(a),
31 ("Am. Compl."), ECF No. 12 (citing 15 U.S.C. § 78j(B); 17
C.F.R. § 240.10b-5).  The text of the Securities Exchange Act,
15 U.S.C. §§ 78a-78qq, seems straightforward: it exempts notes
that mature in nine months or less from regulation as a
"security."  See 15 U.S.C. § 78c(a)(10) (providing that,
although "[t]he term 'security' means any note," it does not
encapsulate "any note . . . which has a maturity at the time of
issuance of not exceeding nine months") (the "Nine Month

Exclusion"). Yet even a seemingly clear statute sometimes reveals hidden meanings after a closer look. See, e.g., Yates v. United States, 135 S. Ct. 1074, 1079 (2015) (ruling, under the Sarbanes-Oxley Act, that a fish is not a "tangible object," although a fish certainly can be touched). This is such a statute. The Supreme Court instructs courts that "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish" with the Securities Exchange Act and its earlier counterpart, the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa. Reves v. Ernst & Young, 494 U.S. 56, 63 (1990). Further, while no court in the First Circuit has considered the issue, several courts and the United States Securities and Exchange Commission ("SEC") construe the Nine-Month Exclusion to exempt only certain high-quality debt issued to banks (so-called "commercial paper"). See, e.g., SEC v. R.G. Reynolds Enters., Inc., 952 F.2d 1125, 1132 (9th Cir. 1991) (citing Securities Act Release No. 33-4412, 26 Fed. Reg. 9158 (1961)); see generally Wendy Gerwick Couture, The Securities Acts' Treatment of Notes Maturing in Less than Nine Months: A Solution to the Enigma, 31 Sec. Reg. L.J. 496 (2003).

Yet this approach clashes with the statutory text's plain meaning. See In re Hill, 562 F.3d 29, 32 (1st Cir. 2009). Although the Court agrees that the Nine Month Exclusion exempts

commercial paper, nothing in the Securities Exchange Act's text, purpose, or legislative history cabins the Nine Month Exclusion to commercial paper alone. Instead, a better reading of the Nine Month Exclusion flips the presumption that "any note" is a security under the Securities Exchange Act. That is, though in the usual course courts are to presume that "any note" is a security, notes that mature in nine months or less (such as the one before the Court, which matures in nine months on the dot) are presumptively <u>not</u> securities. In the Court's eyes, this reading of the statute is more correct.

Yet there is more to law and justice than correct statutory interpretation. The Court sees little benefit in unsettling nearly fifty years of consistent case law narrowly interpreting the Nine Month Exclusion, even though that reading is faulty. <u>See</u> <u>Reves</u>, 494 U.S. at 74-75 (Stevens, J., concurring) (citing cases and persuasively arguing that "such a settled construction of an important federal statute should not be disturbed unless and until Congress so decides"). This may be one of those matters where, as Justice Brandeis taught, "it is more important that the applicable rule of law be settled than that it be settled right." <u>Burnet</u> v. <u>Coronado Oil & Gas Co.</u>, 285 U.S. 393, 406 (1932) (Brandeis, J., dissenting); <u>see</u> <u>Kimble</u> v. <u>Marvel Entertainment, LLC</u>, 135 S. Ct. 2401, 2409 (2015).

In any event, the Court need not decide whether the loan in this case is a security because, even assuming that it is, the plaintiff has failed adequately to plead fraud. The Court thus DISMISSES the plaintiff's Securities Exchange Act claim for failure to state a claim. It then declines to exercise supplemental jurisdiction over the remaining state law claims. Accordingly, the Court DENIES the motion for a default judgment, ECF No. 25, and DISMISSES the case for want of jurisdiction.

## II. BACKGROUND

### A. Procedural History

This case arises out of a loan transaction between Auctus Fund, LLC ("Auctus") and Sauer Energy, Inc. ("Sauer"). Alleging that the transaction had soured, Auctus sued Sauer on May 1, 2019. Compl. Demand Jury Trial ("Compl."), ECF No. 1. Since Auctus based federal jurisdiction on diversity of citizenship and Auctus is a limited liability company, the Court ordered Auctus to submit the citizenship information of its members within two weeks of July 1, 2019. Electronic Clerk's Notes, ECF No. 11; see Wolf v. Altitude Costa LLC, 347 F. Supp. 3d 106, 109 (D.P.R. 2018) (observing that, for diversity jurisdiction purposes, "[a]n LLC shares the citizenship of all its members") (citing D.B. Zwirn Special Opportunities Fund, L.P. v. Mehrotra, 661 F.3d 124, 125 (1st Cir. 2011) (per curiam)).

Auctus responded to the Court's order on July 15, 2019 with an amended complaint that claimed that Sauer violated the federal securities laws, which it mistakenly thought mooted the Court's order.  See Am. Compl. ¶ 6; Pl. Auctus Fund, LLC's Initial Resp. July 22nd Order Show Cause ("Initial Resp. Show Cause") 3-4, ECF No. 14.  In its amended complaint, Auctus alleged that Sauer violated section 12(a)(2) of the Securities Act and section 10(b) of the Securities Exchange Act.  Am. Compl. ¶ 31.  The amended complaint did not allege that diversity of citizenship vested this Court with subject matter jurisdiction.  See generally Am. Compl.

Consequently, on July 22, 2019, the Court ordered Auctus to show cause why (1) it had not complied with the Court's order and (2) the Court ought not dismiss Auctus's federal securities law claims for failure to state a claim.  Order Show Cause 2, 7, ECF No. 13; Auctus Fund, LLC v. Sauer Energy, Inc., 393 F. Supp. 3d 139, 139-42 (D. Mass. 2019).  As for the second part of its Order, the Court raised two concerns.  First, the Court noted that it had previously questioned similar claims that Auctus raised in a previous suit and that Auctus defended only its Securities Exchange Act -- not its Securities Act -- claim.  Id. at 140-41.  Second, the Court acknowledged that it had ruled that the similar Auctus Securities Exchange Act claim was colorable -- that is, whether it was sufficiently serious to

require a decision on its merits -- in light of cases that Auctus had cited but that the Court continued to harbor serious doubt about its plausibility -- that is, whether as matter of law, Auctus's complaint, taken as true, merited relief. Id. at 141-42. In particular, the Court notified Auctus that it seriously doubted whether Auctus's loan qualified as a security under the Securities Exchange Act because Sauer's debt matured in nine months. Id.

Auctus first responded to the Order to Show Cause on July 29, 2019 with a list of the unique residences of its members. Initial Resp. Show Cause, Ex. A, Aff. Louis Posner Ex. 1 ("Membership List"), ECF No. 14-2. With the Court's permission to file a supplemental response, Auctus submitted a memorandum on August 26, 2019 that explained its position as to the merits of its federal securities law claims.[1] Pl. Auctus Fund, LLC's Further Resp. July 22nd Order Show Cause ("Resp."), ECF No. 23.

Since Sauer had not yet appeared or answered either complaint, Auctus moved for an entry of default on August 9,

---

[1] Auctus devotes some of its supplemental memorandum to urging the Court to rule that it has jurisdiction over the Securities Exchange Act claim. Resp. 4-6. The Court does not doubt that it has jurisdiction to consider Auctus's claims. See Order 1, Auctus Fund, LLC v. Sunstock, Inc., Civ. A. No. 18-12568-WGY (D. Mass. May 30, 2019), ECF No. 48. Courts ought resolve non-frivolous disputed questions of law on the merits, not on jurisdictional grounds. Here, the Court thus takes up the issue of whether Auctus bought a security as a merits issue.

[6]

2019, ECF No. 16, which the Court granted on August 13, 2019, ECF Nos. 19, 20. On August 29, Auctus moved for a default judgment. See Pl. Auctus Fund, LLC's Mot. Entry Default Judgment Damages, Equitable Relief & Permanent Inj. Compelling Conversion Debt Public SENY Shares Against Def. Sauer Energy, Inc., ECF No. 25; Pl. Auctus Fund, LLC's Mem. Supp. Mot. Entry Default Judgment Damages, Equitable Relief & Permanent Inj. Compelling Conversion Debt Public SENY Shares Against Def. Sauer Energy, Inc., ECF No. 26.

At a hearing on September 5, 2019 that Sauer again failed to attend, the Court accepted Auctus's factual allegations in its amended complaint as uncontested and true. Electronic Clerk's Notes, ECF No. 28. It proceeded to dismiss Auctus's claim that Sauer violated the Securities Act but took under advisement whether to enter judgment on the Securities Exchange Act and state law claims. Id.

For the reasons that follow, the Court dismisses Auctus's Securities Exchange Act claim. Given that the case no longer involves a federal claim, the Court declines to exercise supplemental jurisdiction to rule on Auctus's state law claims. See Rossi v. Gemma, 489 F.3d 26, 39 (1st Cir. 2007) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental state-law

claims." (quoting <u>Rodriguez</u> v. <u>Doral Mortg. Corp.</u>, 57 F.3d 1168, 1177 (1st Cir. 1995) and citing 28 U.S.C. § 1367(c)(3))).

**B. Facts Alleged**

Auctus is a Boston-based limited liability company, apparently in the business of loaning money on a short-term basis to other businesses. Am. Compl. ¶¶ 4, 22; <u>see, e.g.</u>, Compl. & Demand Jury Trial, Ex. B, Convertible Promissory Note, <u>Auctus Fund, LLC</u> v. <u>GenesysID, Inc.</u>, Civ. A. No. 17-12205-WGY (Nov. 8, 2017), ECF No. 1-2 (convertible promissory note that matured in nine months attached to complaint alleging corporate defendant breached that note); Compl. & Demand Jury Trial, Ex. B, Convertible Promissory Note, <u>Auctus Fund, LLC</u> v. <u>RedHawk Holdings Corp.</u>, Civ. A. No. 18-12020-WGY (Sept. 26, 2018), ECF No. 1-2 (same); <u>Auctus Fund, LLC</u> v. <u>RedHawk Holdings Corp.</u>, Civ. A. No. 19-11440-WGY (June 28, 2019), ECF No. 1-3 (same). Auctus's members reside in California, Massachusetts, and New York, among other jurisdictions. Membership List 1. Sauer exists as a corporation under Nevada law and maintains its principal place of business in California. Am. Compl. ¶ 5. Sauer designs, manufactures, and sells wind turbines. <u>Id.</u> ¶ 21.

Pursuant to a "Securities Purchase Agreement" and a "Convertible Promissory Note" (collectively, the "Loan Instruments") executed on April 27, 2018, Auctus loaned Sauer $114,000. <u>See</u> Am. Compl. ¶ 9, Ex. A, Securities Purchase

Agreement, ECF No. 12-2 & Ex. B, Convertible Promissory Note,
ECF No. 12-3. That day, Sauer issued the Convertible Promissory
Note, which provides that it matures on January 27, 2019 -- nine
calendar months from the issuance date. Convertible Promissory
Note 1. The Securities Purchase Agreement states that the
Securities Act exempts the parties from registering the
Convertible Promissory Note as a security (although it does not
specify the exemptions that apply) and requires Sauer to comply
with any obligations that it might have under the Securities and
Securities Exchange Acts. Securities Purchase Agreement 1 & §§
3.g, 4.j. Among other things, the Convertible Promissory Note
gives Auctus a qualified right to convert the principal and
interest payments into shares of Sauer's common stock.
Convertible Promissory Note art. 1. It further describes
penalty obligations that Sauer would owe Auctus were Sauer to
cause an "Event of Default." Convertible Promissory Note
art. 3.

The amended complaint does not detail the negotiations that
preceded the Loan Instruments. The Securities Purchase
Agreement, however, reflects that Auctus bought the Convertible
Promissory Note as part of a private sale, not in an offering of
notes to the general public. See Securities Purchase Agreement
§§ 2-3; see also Resp. 7-16 (explaining that Auctus meant for
these representations to ensure that the purchase of the

Convertible Promissory Note constituted an exempt transaction because it did not involve a public offering). The amended complaint nonetheless suggests that Sauer misled Auctus in the negotiations. Am. Compl. ¶¶ 31, 34-35, 60, 63, 67. To that end, the amended complaint reprints four press releases that Sauer published prior to issuing the Convertible Promissory Note and claims that the releases "were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to [Auctus]." Id. ¶¶ 12-15. Auctus repeats that conclusion with respect to two press releases that Sauer sent after it issued the Convertible Promissory Note. Id. ¶¶ 16-17. The amended complaint does not deign to identify the precise assertions in those press releases that were inaccurate or point to information with which Sauer should have supplemented those statements. See generally Id. ¶¶ 12-17.

The amended complaint also insists, that "[u]pon information and belief, [Sauer] made misrepresentations regarding the supposed use of proceeds" from the Convertible Promissory Note. Id. ¶ 24. Yet the amended complaint does not state what Sauer's officers told Auctus's officers about Sauer's purpose in selling Auctus the Convertible Promissory Note, except to the extent that "Auctus never agreed and never authorized [Sauer] to simply apply the proceeds of its investment to pay off a creditor." See id. Additionally,

Auctus does not point to a provision in the Loan Instruments that prohibited Sauer from using the proceeds to pay off a debt. See id. ¶¶ 20-25. Indeed, the Securities Purchase Agreement contemplates that Sauer would use the proceeds for its "working capital."[2] Securities Purchase Agreement § 4.c. In any event, on July 23, 2018, Sauer disclosed in its quarterly Securities and Exchange Commission report that it had spent at least part of the funds that it had borrowed from Auctus to pay off a $78,000 debt to a different creditor. Am. Compl. ¶ 23.

The amended complaint goes on to allege that, sometime after July 23, 2018, Sauer "incurred and/or caused several Events of Default." Id. ¶ 26. In particular, the amended

---

[2] Section 4.c of the Securities Purchase Agreement states: Use of Proceeds. The Company shall use the proceeds from the sale of the [Convertible Promissory] Note for working capital and other general corporate purposes and shall not, directly or indirectly, use such proceeds for any loan to or investment in any other corporation, partnership, enterprise or other person (except in connection with its currently existing direct or indirect Subsidiaries).

Securities Purchase Agreement § 4.c. Paying off a debt is a general corporate purchase and not a loan or investment in the creditor. What's more, the Securities Purchase Agreement states:

Entire Agreement; Amendments. This Agreement, the [Convertible Promissory] Note and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor the Buyer makes any representation, warranty, covenant or undertaking with respect to such matters.

Id. § 9.e.

complaint states that Sauer failed to pay the principal and interest on the Convertible Promissory Note. Id. ¶¶ 26-27. The amended complaint calculates damages and penalties to be $511,226.16 through April 22, 2019, considering December 14, 2018 as the default date. Id. ¶ 28 & Ex. 1, ECF No. 12-1.

Auctus contends that Sauer violated the antifraud provisions of the Securities and Securities Exchange Acts. Am. Compl. ¶¶ 30-32. It further complains that Sauer breached various contractual, fiduciary, and tort duties under state common law, in addition to offending the Massachusetts Uniform Securities and Consumer Protection Acts. Id. ¶¶ 33-68.

## III. LEGAL FRAMEWORK

Aside from the need to rule on the order to show cause, ECF No. 13, this Court addresses Auctus's motion to enter a default judgment pursuant to Rule 55 of the Federal Rules of Civil Procedure. A default judgment motion shares the same standard of review as that of a motion to dismiss for failure to state a claim. See Ramos-Falcon v. Autoridad de Energia Electrica, 301 F.3d 1, 2 (1st Cir. 2002). After entry of default, the Court "examine[s] a plaintiff's complaint, taking all well-pleaded factual allegations as true, to determine whether it alleges a cause of action." Id. (citing Quirindongo Pacheco v. Rolon Morales, 953 F.2d 15, 16 (1st Cir. 1992)). It also sets aside the amended complaint's legal conclusions in scrutinizing

whether the facts that it provides demonstrate Auctus's

entitlement to relief.  See Cragin v. Lovell, 109 U.S. 194, 199

(1883) ("[A] mere conclusion of law . . . is not admitted by

. . . default.").

Auctus's remaining securities law claim arises under

section 10(b) of the Securities Exchange Act.  Am. Compl. ¶ 31.

That section outlaws the use of "manipulative or deceptive

device" in the sale of a "security," registered or not.  15

U.S.C. § 78j(b).  Securities and Exchange Commission Rule 10b-5

specifies that a securities seller violates section 10(b) when

the seller makes "any untrue statement of material fact" or

"omit[s] to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which

they were made, not misleading."  17 C.F.R. § 240.10b-5.[3]  To

succeed on an action under section 10(b) and rule 10b-5, a

plaintiff must show that (1) the defendant made a "material

misrepresentation or omission" (2) with "scienter" and (3) in

connection with purchasing or selling a "security."  Amgen Inc.

v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 460-61

(2013) (quoting Matrixx Initiatives, Inc. v. Siracusano, 563

U.S. 27, 37-38 (2011)).  The plaintiff must also demonstrate

_____

[3] Although neither section 10(b) nor rule 10b-5 explicitly
provides a private right of action, the courts have inferred
one.  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 748-
49 (1975).

that it (4) relied "upon the misrepresentation or omission," and that it suffered (5) "economic loss" (6) caused by that misrepresentation or omission. Id.[4]

Section 3(a)(10) of the Securities Exchange Act sets forth a list of instruments that qualify as securities, such as notes, stock, and investment contracts, under that Act. 15 U.S.C. § 78c(a)(10). That section expressly excludes, however, notes with "a maturity at the time of issuance of not exceeding nine months." Id. The preface to the Securities Exchange Act's definition section tempers each subsection by announcing that its definitions control "unless the context otherwise requires." 15 U.S.C. § 78c(a) (the "Context Clause").

## IV. ANALYSIS

The amended complaint does not state a plausible Securities Exchange Act claim.[5] The Court ordered Auctus to show cause since, on review of the amended complaint, it thought that

---

[4] The amended complaint also claims that Sauer "employed manipulative and deceptive devices and contrivances; b) employed devices, schemes and artifices to defraud; . . . and d) engaged in acts, practices and a course of business which operated as a fraud or deceit upon [Auctus]." Am. Compl. ¶ 31. The amended complaint, however, does not appear to contain any factual allegations related to any of these theories.

[5] As the Court notes above, it dismissed Auctus's claim that Sauer issued a misleading prospectus at the hearing because the amended complaint did not allege Auctus purchased the note in a public offering. See Fed. R. Civ. P. 12(b)(6); Gustafson v. Alloyd Co., 513 U.S. 561, 584 (1995).

Auctus failed to allege that Sauer sold it a "security" within the meaning of the Securities Exchange Act; that is, that Auctus did not plead the third element of the section 10(b) cause of action.

With the benefit of Auctus's brief, the Court now sets forth its considered view that the Nine Month Exclusion is best read as presumptively excluding short-term loans such as Auctus's from the definition of "security" in the Securities Exchange Act. Nonetheless, the Court is wary of disturbing a longstanding judicial consensus to the contrary and, in any event, need not reach this question here. That is because the Court rules that Auctus's section 10(b) claim is deficient for a different reason -- namely, the complaint fails adequately to plead fraud. Consequently, as more fully explained below, the Court DISMISSES Auctus's section 10(b) claim.

### A.   Synthesizing _Reves_, the Nine Month Exclusion, and the Context Clause

When a note matures more than nine months from issuance, the Supreme Court presumes that the Securities Exchange Act covers it. _Reves_, 494 U.S. at 65. Prior to _Reves_, the Second Circuit presumed that notes maturing in nine months or less are not securities. _Exchange Nat'l Bank of Chi._ v. _Touche Ross & Co._, 544 F.2d 1126, 1137-38 (2d Cir. 1976) (Friendly, J.) ("A party asserting that a note . . . with a maturity of nine months

or less is within [the Securities Exchange Act] has the burden of showing that 'the context otherwise requires.'"); see also Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 937 (2d Cir. 1984) (Friendly, J.).[6] The Supreme Court in Reves did not decide whether any presumption applied to such notes. 494 U.S. at 65 n.3.[7] Courts in the Second Circuit have not consistently applied Exchange National Bank's presumption since Reves. See, e.g., Roer v. Oxbridge Inc., 198 F. Supp. 2d 212, 223 (E.D.N.Y. 2001) (presuming that a short-term note is a security); Varnberg v. Minnick, 760 F. Supp. 315, 325 (S.D.N.Y. 1991) (presuming the opposite). Courts outside the Second Circuit, such as the Ninth and Tenth circuits, have presumed that short-term notes are

---

[6] The Second Circuit's pre-Reves presumption is consistent with its prior holding that "the mere fact that a note has a maturity of less than nine months does not take the case out of Rule 10b-5, unless the note fits the general notion of 'commercial paper.'" Zeller v. Bogue Elec. Mfg. Corp., 476 F.2d 795, 800 (2d Cir. 1973) (Friendly, J.) (emphasis added); see also SEC v. American Bd. of Trade, Inc., 751 F.2d 529, 538-39 & n.8 (2d Cir. 1984) (Friendly, J.).

[7] In a footnote, the Supreme Court puzzlingly read the Second Circuit's decision in Exchange National Bank to say that "[n]o presumption of any kind attached to notes of less than nine months' duration." Reves, 494 U.S. at 65 n.3. That is not what the Second Circuit said, however, and thus this Court respectfully disagrees with the Supreme Court's characterization (in dicta) of the Second Circuit's opinion. No lower court is eager to find errors in opinions of the Supreme Court. Yet there is some solace in the Supreme Court's later observation that footnote 4 of Reves contained a "misreading" of a case in "passing dictum." SEC v. Edwards, 540 U.S. 389, 396 (2004). This Court now perceives a similar "misreading" in footnote 3.

securities.  See, e.g., SEC v. Thompson, 732 F.3d 1151, 1159 n.7

(10th Cir. 2013) (citing Holloway v. Peat, Marwick, Mitchell &

Co., 900 F.2d 1485, 1488-89 (10th Cir. 1990); R.G. Reynolds

Enters., 952 F.2d at 1132 (9th Cir. 1991)).

The Second Circuit's presumption appears the best reading

of the statute because it synthesizes the Nine Month Exclusion

and the Context Clause.  The courts that reject the Second

Circuit's presumption do so on a narrow view of the Nine Month

Exclusion that they justify based on sparse legislative history

and an appeal to the Securities Exchange Act's purpose.  Those

courts rule that the Nine Month Exclusion removes only

commercial paper from the Securities Exchange Act's scope.  The

Court declines to adopt such a strained reading of the

Securities Exchange Act's text, legislative history, and

purpose.

### 1.  Plain Text

As the Court observed in its order to show cause, the Nine

Month Exclusion does not admit of any wiggle room because of any

technical language or vague wording.  The statute provides in

relevant part that the "term 'security' means any note . . . but

shall not include . . . any note . . . which has a maturity at

the time of issuance of not exceeding nine months."  15 U.S.C.

§ 78c(a)(10).  The statute uses the phrase "any note" in both

the overarching definition and the Nine Month Exclusion.

Logically, then, the Nine Month Exclusion must exempt some instruments denominated as notes from the Securities Exchange Act's scope.

Nevertheless, the Supreme Court has taught that the statute's text must be read "against the backdrop of what Congress was attempting to accomplish" and "Congress's purpose . . . to regulate investments." Reves, 494 U.S. at 61-63. In so teaching, the Supreme Court recognized that the Context Clause reflects Congress's attempt to ensure that courts would not woodenly interpret the Securities Exchange Act. See Marine Bank v. Weaver, 455 U.S. 551, 556 (1982); Reves, 494 U.S. at 76 (Stevens, J., concurring) ("The context clause . . . permits a judicial construction of the statute which harmonizes the facially rigid terms of the 9-month exclusion with the evident intent of Congress."). Accordingly, applying a presumption against a note that matures in nine month or less qualifying as a security gives effect to the plain text of the Securities Exchange Act. At the same time, the presumption may be rebutted if it appears that Congress's purpose would be thwarted.

## 2. Legislative History

The legislative history of the Nine Month Exclusion does not reveal that it exempts only commercial paper. The Court agrees with Chief Justice Rehnquist's four-Justice dissent in Reves that the Securities Exchange Act's legislative history

does not demonstrate that its drafters meant to exempt only high-quality commercial paper. See Reves, 494 U.S. at 79-80 (Rehnquist, C.J., concurring in part and dissenting in part); Auctus, 393 F. Supp. 3d at 141-42. In reviewing the relevant legislative history, the Court bears in mind that it displaces the statute's plain meaning only if the plain meaning is "antithetical" to the drafters' intent. United States v. Gordon, 875 F.3d 26, 34 (1st Cir. 2017) (quoting Hill, 562 F.3d at 32).

The courts that limit the Nine Month Exclusion to commercial paper rely on the related statutes' legislative histories, not the Securities Exchange Act's. See Reves, 494 U.S. at 79-80 (Rehnquist, C.J., concurring in part and dissenting in part); id. at 75-76 (Stevens, J., concurring) (collecting cases). Those courts place much weight on the Supreme Court's pronouncements that, in particular, the definition of security in the Securities Exchange Act "is essentially the same" as its definition in the Securities Act. See Weaver, 455 U.S. at 555 n.3. The Supreme Court has quoted the Senate Report on the Securities Exchange Act, which states that "its definition of security was intended to be 'substantially the same as (that contained) in the Securities Act of 1933.'" Tcherepnin v. Knight, 389 U.S. 332, 342 (1967) (alteration in original) (quoting S. Rep. No. 792, 73d Cong., 2d

Sess., at 14 (1934)). Yet "substantially the same" allows for minor differences between the definitions to exist. The Nine Month Exclusion appears to be such a minor deviation.

Unlike the Nine Month Exclusion in the Securities Exchange Act, the parallel provision in the Securities Act -- which exempts the instrument from registration only -- applies only to "any note . . . which arises out of a current transaction or the proceeds of which have been or are to be used for current transactions." 15 U.S.C. § 77c(a)(3); Reves, 494 U.S. at 80 (Rehnquist, C.J., concurring in part and dissenting in part) (explaining that the Securities Act's exception thus more clearly invokes commercial paper). Moreover, though courts often cite legislative history and Supreme Court decisions interpreting securities laws covering commercial paper in this context, those laws' language differs dramatically from that of the Securities Exchange Act.[8] Further, the Supreme Court

---

[8] For example, the Second Circuit in Exchange National Bank observed that the Public Utility Holding Company Act of 1935, the Trust Indenture Act of 1939, and the Investment Company Act of 1940 include similar exemptions. 544 F.2d at 1132 & n.10; see also Sanders v. John Nuveen & Co., 463 F.2d 1075, 1080 (7th Cir. 1972) (same, except not discussing Trust Indenture Act of 1939). Each Act, however, includes a slightly different exemption.
First, the Public Utility Holding Company Act of 1935 exempted notes that:
(1) [were] not part of a public offering, (2) mature[d] or [] renewed for not more than nine months, exclusive of days of grace, after the date of such issue, renewal,

accomplishes the goal of aligning the definition of "security" between the Securities Exchange Act and the Securities Act by providing that the same principles for determining whether an

---

> or guaranty thereof, and (3) aggregate[d] (together with all other then outstanding notes and drafts of a maturity of nine months or less, exclusive of days of grace, as to which such company is primarily or secondarily liable) not more than 5 per centum of the principal amount and par value of the other securities of such company then outstanding, or such greater per centum

Ch. 687, tit. I, § 6, 49 Stat. 814 (repealed 2005).

Second, the Trust Indenture Act of 1939 not only explicitly incorporates the Securities Act's exemption but also includes another exemption that the Second Circuit characterized as excluding commercial paper. See 15 U.S.C. § 77ddd(a)(4); Exchange Nat'l Bank, 544 F.2d at 1132 (holding that 15 U.S.C. § 77ddd(a)(1)'s exclusion for "any security other than (A) a note, bond, debenture, or evidence of indebtedness, whether or not secured, or (B) a certificate of interest or participation in any such note, bond, debenture, or evidence of indebtedness, or (C) a temporary certificate for, or guarantee of, any such note, bond, debenture, evidence of indebtedness, or certificate" constitutes an "explicit exemption of some sort for activities in commercial paper").

Third, the Investment Company Act expresses no doubt about the type of instrument it excludes from its ambit:

> "Short-term paper" means any note . . . payable on demand or having a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof payable on demand or having a maturity likewise limited; and such other classes of securities, of a commercial rather than an investment character, as the Commission may designate by rules and regulations.

15 U.S.C. § 80a-2(a)(38); see also id. §§ 80a-3(b)(3), (c)(1), 13 (exempting short-term paper from definition of security in certain circumstances). This definition, unlike Reves's interpretation of the Securities Exchange and Securities Acts, includes demand notes in its class of instruments exempt from regulation. See 494 U.S. at 73-74.

The Court assumes that Congress intentionally used different language to exclude different types of short-term notes from each act.

instrument falls within an enumerated term apply in both statutes.  See Tcherepnin, 389 U.S. at 342.

Auctus's analysis assumes that Congress successfully manifested its intent to limit the exclusion for notes maturing in nine months in the Securities Act.  Chief Justice Rehnquist doubted that in his Reves dissent, observing the relevant Securities Act legislative history spoke to draft versions of the exemption that, among other things, explicitly used the phrase "commercial paper."  Reves, 494 U.S. at 79-80 (Rehnquist, C.J., concurring in part and dissenting in part).  As Chief Justice Rehnquist explained, Congress deleted the explicit references to "commercial paper" prior to passing the bill, thereby limiting the usefulness of the legislative history.  Id. (citing H.R. Rep. No. 85, 73d Cong., 1st Sess., 15 (1933); S. Rep. No. 47, 73d Cong., 1st Sess., 3-4 (1933)).  It does not follow from the fact that the exemption for notes maturing within nine months "encompasses" commercial paper that the exemption encompasses only instruments meeting the industry definition of commercial paper.  See Securities Indus. Ass'n v. Board of Governors of Fed. Reserve Sys., 468 U.S. 137, 150-51 (1984); Reves, 494 U.S. at 81 (Rehnquist, C.J., concurring in part and dissenting in part).

In sum, the Court declines to rely on legislative history from another statute (with different wording) to reject the plain meaning of the statute at hand.

### 3. Incorporating Purpose and Context

The Securities Exchange Act's purpose does not support limiting the Nine Month Exclusion to commercial paper. Other courts have taken the Context Clause as a mandate to so limit the Nine Month Exclusion. This Court disagrees. The Court instead reads the Context Clause as pulling instruments under the sway of the Securities Exchange Act when its purpose would otherwise be undermined.

Some general principles aid the Court in its analysis of the Context Clause and Congress's purpose. First, that clause provides the Court with only limited authority to set aside the statutory text because the Supreme Court "never has conducted its analysis [of securities law provisions] entirely apart from the statutory language." See <u>Pinter</u> v. <u>Dahl</u>, 486 U.S. 622, 653 (1988). Moreover, "Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud." <u>Weaver</u>, 455 U.S. at 556. Congress sought "to eliminate serious abuses in a largely unregulated securities market" by focusing on "the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for

regulation to prevent fraud and to protect the interest of investors." United Hous. Found., Inc. v. Forman, 421 U.S. 837, 849 (1975).

Reves's "family resemblance test" lays out factors for determining which notes implicate these purposes. See Reves, 494 U.S. at 67. Courts presume that notes not subject to the Nine Month Exclusion are securities. See id. The simplest way, then, to determine if "the context otherwise requires" that a note "which has a maturity at the time of issuance of not exceeding nine months" nevertheless constitutes a security, is to switch the burden -- that is, to require a showing that it is a security. With this approach, courts should presume that a short-term note is not a security unless that presumption is rebutted.

Moreover, a rebuttable presumption avoids providing unscrupulous promoters a simple roadmap for committing securities fraud, while placing the burden to show that the Nine Month Exclusion does not apply on the plaintiff or prosecutor. Were the Court to adopt a literal reading of the Nine Month Exclusion, a fraudster could avoid liability under the Securities Exchange Act by promising repayment in under nine months even in the instance where the fraudster's note otherwise constituted a security under the Securities Exchange Act. See Harold S. Bloomenthal & Samuel Wolff, 3 Sec. & Fed. Corp. Law §

[24]

2:11 (2d ed. 2019) ("If the Section 3(a)(3) exemption and the
Section 3(a)(10) exclusion are applied literally . . . [they]
will open the door to the widespread issuance of junk notes by
all categories of issuers."). In cases of such fraud, the
government and private plaintiffs ought have little difficulty
in rebutting the presumption.

### 4. Settled Law and Right Law

Notwithstanding the analysis above, the Court does not here
adopt a reading of the Nine Month Exclusion that would
presumptively exempt short-term notes other than commercial
paper. For almost fifty years, courts have consistently held
that "when Congress spoke of notes with a maturity not exceeding
nine months, it meant commercial paper, not investment
securities." Sanders v. John Nuveen & Co., 463 F.2d 1075, 1080
(7th Cir. 1972); see Reves, 494 U.S. at 74 (Stevens, J.,
concurring) (collecting cases); Fox v. Dream Trust, 743 F. Supp.
2d 389, 401 (D.N.J. 2010) (noting that "it is the unanimous
finding of other Circuit Court of Appeals that have examined the
issue, as well as the SEC itself, that the short-term note
exception applies only to so-called 'commercial paper'"). True,
the Second Circuit's opinion in Exchange National Bank was not
so categorical and has persuaded this Court that the Nine Month
Exclusion, correctly interpreted, creates a rebuttable
presumption that any short-term loan is not a security, whether

or not the loan is prime commercial paper. Yet this reverse
presumption has rarely, if ever, been applied by the courts.
Indeed, this Court has found just a single instance in which the
Second Circuit's presumption for short-term loans was actually
invoked. See Varnberg v. Minnick, 760 F. Supp. 315, 325
(S.D.N.Y. 1991). Three decades have since elapsed without this
presumption receiving the slightest judicial attention. It did
not help matters that the Supreme Court mistakenly denied, in
dictum, that the presumption ever existed. See supra note 7
(discussing Reves, 494 U.S. at 65 n.3).

The Court sees little reason to revive the Second Circuit's
presumption at this late hour when Congress could, if it wishes,
overrule the entrenched judicial gloss on the statute. The
Court takes to heart Justice Stevens' admonition that "[a]
departure from this reliable consensus would upset the justified
expectations of both the legal and investment communities."
Reves, 494 U.S. at 75 (Stevens, J., concurring). Perhaps the
judicial consensus is unfaithful to the statute's language, but
in this matter the Court agrees with Justice Brandeis that "it
is more important that the applicable rule of law be settled
than that it be settled right." Burnet, 285 U.S. at 406
(Brandeis, J., dissenting).

In any case, the Court need not (and does not) decide the
scope of the Nine Month Exclusion here because, as will now be

explained, Auctus's claim under the Securities Exchange Act fails for a different reason.

**B.    Auctus's Complaint Fails Adequately to Plead Fraud**

The Court cannot identify in the amended complaint any specific statement of Sauer's that the amended complaint objects to as false or misleading in a non-conclusory fashion.  Nor does the amended complaint suggest that Sauer should have included a particular fact in any communication to the public or with Auctus.  Fraud claims are generally subjected to Fed. R. Civ. P. 9(b)'s requirement that plaintiffs plead them "with particularity," and here they must also satisfy the specific pleading standards imposed by the Private Securities Litigation Reform Act.  That Act provides that complaints such as Auctus's must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Auctus has not done so here.

This failure provides ample reason to dismiss the federal securities law claim.  Indeed, Judge Burroughs has ruled that similar complaints lodged by Auctus do not state claims for fraudulent or negligent misrepresentation under state law because they omitted an allegation of a misrepresentation.  <u>See</u>

Auctus Fund, LLC v. First Columbia Gold Corp., Civ. A. No. 17-10543-ADB, 2019 WL 1316736, at *2 (D. Mass. Mar. 21, 2019) (Burroughs, J.); Auctus Fund, LLC v. ERHC Energy, Inc., Civ. A. No. 18-10216-ADB, 2019 WL 1316749, at *2 (D. Mass. Mar. 21, 2019) (Burroughs, J.). The present amended complaint is likewise deficient. Accordingly, the amended complaint's Securities Exchange Act claim fails to state a claim upon which relief may be granted.[9]

## V. CONCLUSION

For the foregoing reasons, the Court rules that Auctus is not entitled to any relief on its Securities Exchange Act claim. In light of the Court's oral dismissal of the Securities Act

---

[9] This Court's previous Orders did not alert Auctus that the Court was considering dismissing the section 10(b) claim on this ground, and the Court appreciates that ordinarily a court may not dismiss a complaint sua sponte without first giving the plaintiff notice of the defect and opportunity to respond. See Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 30-31 (1st Cir. 2000). Here, however, Auctus was sufficiently on notice due to the two decisions by Judge Burroughs in another session of this Court (also default judgments) that were issued just a few months before Auctus filed its present amended complaint with precisely the same flaws. After those two rulings, Auctus can hardly claim unfair surprise in this Court. Moreover, this Court did order Auctus to show cause "why the Court ought not dismiss Auctus's securities law count for failure to state a claim" and stated that "[i]f Auctus neither demonstrates that diversity jurisdiction exists nor shows its allegations amount to even one viable securities law claim, this Court shall dismiss the securities law count and decline to exercise supplemental jurisdiction over Auctus's state law claims." 393 F. Supp. 3d at 142. That language, together with Judge Burroughs' opinions, gave Auctus sufficient notice and opportunity to respond.

claim, the Court holds that the case involves neither a viable claim under the federal securities laws nor any other federal question. The remaining claims in this case involve complex questions of state law. Accordingly, the Court DISMISSES the remaining claims for want of subject matter jurisdiction. See 28 U.S.C. § 1367(c)(3); Rossi, 489 F.3d at 39.


**SO ORDERED.**

WILLIAM G. YOUNG
DISTRICT JUDGE